May it please the Court, Edward Himmelfarb of the Department of Justice, representing the United States in this action under the Federal Tort Claims Act. This is a wrongful birth case. In a wrongful birth case, the doctor's negligence didn't cause the child's birth defects. The claim of negligence was that the doctor negligently failed to provide the parents with sufficient information to allow them to decide whether or not to have an abortion. Unlike a typical medical malpractice case, the plaintiff's injury is not a physical injury. It's a pecuniary injury. And under West Virginia law, the parents are awarded pecuniary damages to cover the amount that's required for them to take care of the child. Also under state law, only the parent here, Ms. Simms, is entitled to recover on the wrongful birth claim. The child, C.J., cannot recover. At the same time, Ms. Simms has no liability for her... The child, C.J., for a great part of this action, was actually involved in it, as I understand. And at some point, the trial court dismissed the matter, is that right? That's correct. He was named as a plaintiff, the government moved to dismiss, and at the very, very end of the trial, in the judgment and the amended judgment order, he was dismissed from the case. Why did it take so long? I am not sure, Your Honor. He doesn't have a cause of action, I mean... He doesn't have a cause of action. The plaintiff admitted... Then he must have thought he did. Mr. Moreland, plaintiff's counsel, told the district judge when they argued the motion that the reason they put him in the case was they thought maybe there would be some kind of trust that needed to be made for his benefit, and that's why he was in the case. But under state law, Mr. Moreland, the plaintiff's counsel, there is no basis under state law to have the child as a plaintiff in this case. The district judge, for all the other mistakes we think he made, correctly decided that the child was not a proper plaintiff in the case under state law. But from a defendant's perspective, if someone brings an action against you and they can't do it, the first thing you do is move to dismiss as to that plaintiff, because you can't sue me. Your Honor, I can't speak to the way the case was litigated at the early stages, but... The way the case is litigated is what this is all about, isn't it? No, I don't think so, Your Honor, because the relevance of having the child in the case in the district court... You're contesting these damages, and assume we know these facts. We understand the whole basis of wrongful birth. We got it all there. So we know what the issues are here in terms of damages. And I say it's the posture of the case, and part of it goes from the inception of, you know, you've got this Medicaid that's being paid by the state of West Virginia, a portion of it has to do with the federal government contributing to it. I just really wonder, why is the state of West Virginia not in this action from the beginning? That puzzles me. I mean, I'm just dealing with how do you fix this, because you're talking millions of dollars. And then at some point, even now, why wouldn't they not be here? Or why... And I know you probably, you know, from the perspective of the other side, you know, maybe Medicaid Department of Justice is the same as the one that's here today, but it would seem to me someone, they ought to care. But a lot of issues in this case, and we could spend hours talking about it, we're not, of course. I beg your pardon? We're not going to spend hours talking about it today. Okay. We've got your briefs here. Right. So give me those issues that you think are the most salient that need some amplification here. Okay. I think the most important thing to start with, we are, you know, our brief is set up point one in the opening brief, and point two, point two is an alternative argument. Point one, the argument under point one is that there's no liability, Ms. Sims has no liability for any of these expenses. And the reason is, her son is a Medicaid recipient. She's not a Medicaid recipient. This is a question of pecuniary damages. In a case involving, a medical malpractice case involving physical injury to the plaintiff is different, because the point of damages, you try to come up with some kind of rough justice, rough compensation for something that's really not compensable. It's because it's pain or it's an injury. In a pecuniary damages case, you know exactly what the loss is, because it's measured in money. By definition, it's measured in money, whereas it's... A bigger point? Let's go issue by issue. Okay. And let's first talk about the medical expenses that have been covered by Medicaid. The question of whether standing alone, does that preclude recovery of the full medical expenses and damages in this wrongful death action? Well, the first thing is that, yes, that there's no recovery for past damages at all, and for the future damages award. And that would be something we've asked the court to remand it to the district court to straighten that out. We offered evidence... That's how you get us all muddled. We're talking past, future. And you're right. It could be the future. But that's an argument within an argument, as to whether the past should be separate from the future. Well, I mean, I think legally, I think you have to look at them somewhat differently. I mean, the issue that's common to both of those... You said she didn't owe you anything, because Medicaid's paid off the expenses. Does that alone say you don't get medical expenses and damages? You don't get that, because under federal law, the mother, who is not a Medicaid recipient, cannot be billed for these expenses. So, I mean, this is the argument we made in the brief. The argument is, the expenses are paid on behalf of the child, who is the Medicaid recipient. The mother cannot be... It's against federal law to bill her for any of those expenses. She's not liable for them. She certainly has not paid anything for it. The claim of... You were a third party. You were a defendant. Instead of being the United States government, you were some major corporation. Because any ruling we hand out would have to apply to just the defendant. We can't look... Unless you tell me, we have to look specifically at the fact that the U.S. government is involved in here. Aside from the offset argument. So, if that's the instance here, and under West Virginia law, essentially, what you're entitled to are the reasonable medical expenses, and under the collateral source rule, which I would say would apply to that type of defendant, and I don't see how you're different, because the Federal Tort Claims Act says you're just like anybody else. Why would the West Virginia law not preclude you from getting to the business of what Medicaid has paid on this? Why would the... I'm not sure I follow your question, Your Honor. I'm sorry. Under the West Virginia law, collateral source rule applies to you, right? Yes. And it is statutory.  Yes, there's a statutory, correct. And that rule, in essence, says you cannot seek this payment that has been made. You cannot, you know, account that payment against the liability that you owe as a defendant. What it says is that after verdict, but before judgment, there has to be a hearing, and we are allowed to introduce evidence under the statute. We're allowed to do... That's a different issue. That issue is in there. The hearing issue is there. Yeah, but I'm trying to... I'm sorry. I was just trying to explain how this would work, even for a private party. For a private party, a private party would be allowed to say that the plaintiff received Medicaid, and that is a collateral source, and therefore it is considered at the hearing to be deducted. If the hearing is not there, what if you have a segregated lien? Well, if you have a lien, the statute says that you don't do this. But here, let me tell you. The lien. Here's the lien. The lien in this case is against the child's recovery. Only against the child. The lien is not against the money. It's the recipient. I'm sorry? The recipient. That's correct. The recipient is the child. The child is the recipient. Is the child getting any money?  The child's not bringing this action. The child can't bring the action. That's correct. That's the point. Your Honor, you have exactly, you've hit it right on the mark here. There's a difference. There's a difference. The mother's getting the money. But the lien doesn't operate against her. That's the problem here. That's the fundamental problem here. The lien does not operate against the mother. I have copies of the lien letters if the Court is interested. The lien operates against the child's recovery. Under state law, the child has no recovery. We're in a big predicament here. The mother's getting millions of dollars. The lien doesn't operate against her. And it operates only against the child. That's the problem. Does West Virginia think it has a lien? The West Virginia, you know, your Honor, Mr. Westphal, our trial counsel, has gotten in touch with the state twice. I asked him to get in touch with the state twice because I was concerned about this. The state said, no, we don't have a lien against the mother. We have a lien against the child. They got that contract. They got that statement when Mama signed, when getting Medicaid, that if she gets something, they got to pay them. That's a whole different thing. When she applied, she was applying on behalf of the child. The child is a recipient. The mother is not a Medicaid recipient. That's the basic problem we have with this case, Your Honor. It's just a lien. I'm sorry? It's just a lien, not a separate contract action based upon that document she signed that says, I will pay you back. That's not what it says, Your Honor. It says the recipient is obligated, not the mother of the recipient. It doesn't work that way. They don't have a right. The state can't go against the mother. That's the basic problem. The statute kept talking sort of interchangeably about recipient, applicant, or legal representative. No? No, I think the recipient, under state law, I mean, I have the language here, if you'll excuse me for a second. Yeah, no, I'm sorry. But the language under the provision that would exempt this from the collateral source statute talks about recipient. The recipient is the person who gets the money. If you look at the lien letters, which we can provide for the court, if you look at the lien letters, it says recipient, and it names the child by his full name, which I'll leave out for now. So the child is the recipient. They can't go against the mother. But I thought West Virginia, I'm getting this all mixed up, but I thought West Virginia law, when it talks about the assignments and the liens, talks about legal representative as well as recipient. No? Well, the legal representative. It seems like if West Virginia law contemplates that this recovery is going to be subordinate and is going to have this lien on it, that's all that really matters. The mother is recovering in her own right. She was suing as the representative of the child also. And that's what was dismissed. It was an individual action and a representative action on behalf of the child. The representative action was dismissed for the reasons we discussed earlier. So the mother is left here as the plaintiff in her own individual right. She's not there as the parent. She's there because she's the parent. That's what the cause of action under state law provides. But she's not there because she's somehow connected with the recovery, getting Medicaid under the state Medicaid plan. One more procedural question about this. So this whole argument that under the MPLA there was no lien here because there was nothing running against the mother, the district court seems not to have caught this. Was this argument presented to the district court? Yeah, we did argue about the lien. The problem about the lien is that there was no actual tangible evidence of the lien in district court. There was a conversation between the judge and Mr. Moreland. Mr. Moreland said, yes, there's a lien. In fact, there is a lien, but the lien is not directed against the child. This is directed against the child, I'm sorry, and not against the mother. So this was not fleshed out in district court,  but it was not the kind of lien that's relevant here. Was that fleshed out for the district court, this is the wrong kind of lien? I'm just trying to figure out if this argument was presented to the district court or whether it needs to go back to the district court or what. Well, you could send it back to the district court, but I think it's, you know, let me say why it wasn't really spelled out as well as it perhaps could have been. As long as the mother was there in a representative capacity, and for shortness I'll refer to this as the child being the plaintiff. So long as the child was the plaintiff, if the case had settled, there would have been possibly an argument from the state of West Virginia that some portion of that was attributable to the child. The defense against that would be, no, it's not because under state law, the child can't possibly be a plaintiff, but he was still a plaintiff in the case. And is he right? What I was asking you about, the child was a plaintiff in this action. That's right. And the judge made this determination. Which determination? The determination that there was a lien. Yeah. Right? That's right. But once you get rid of the child, the child's not a recipient. The child is a recipient. He's a recipient, but the recipient is not part of the action. That's correct, and that's our position, Your Honor. You can't give money to the mother and expect that the lien is going to give it back to the state of West Virginia, or you can't give money to the mother and say that there's a lien and therefore this statutory process under the MPLA doesn't apply because there's a lien. It's the wrong lien. It's a lien against the child. The child is no longer a plaintiff in the case. At the end of the day, you're saying you're entitled to a hearing. Yes. Because you say this collateral source rule doesn't apply. No, there are two collateral source arguments, Your Honor. The first collateral source argument is that it is a collateral source and under the statute we're entitled to the hearing and have it taken away from the damages. The second collateral source argument is under the common law collateral source rule. We've paid the money. We've paid roughly $770. That's the offset. Yes. I'm not talking about that. Okay. Under the state statute, it's defined under the state statute as a collateral source that is deducted from the amount of damages. So we're entitled to that hearing, and the judge thought we didn't have the hearing because what the judge said was this is not federal money at all. It's state money. The federal government gave the money to the state. It's all paid by the state. End of story. It seems like the federal government could go to the state and get the money back then. Well, it's not proper what the district judge did, so we shouldn't have to do that. I'm not sure exactly how we would go about doing that. It all comes down, as I said from the beginning, it all comes down in terms of the state. There are states in which even when you bring a person into the state of Florida, it requires the attorney gentleman to get involved in that action. You know, because they say you just shouldn't sit on the sideline while somebody else does all the work and then come in and say I want my money, although the Federal Attorneys Act does allow the attorney to take a cut, even from that as I understand it. But, you know, in this instance, it just seems like there are some ways around this, and I just don't get the reason why there's no action by the state of West Virginia one way or the other on this, and they're relying on the defendant here to assert their 70% here and try to say you shouldn't be getting it. You know, Your Honor, it's very puzzling. I don't know what the answer is. I represent the federal government, not the state government. I can't really speak for them. I don't know why the Medicaid Division of Justice saying we gave 70% of this money, it's all coming out of the general fund, and therefore we want to get involved. From that perspective, and that's not a capacity you're in, unless you represent every agency in the federal government. I represent the United States, Your Honor. What we're saying is that we're entitled to we pay the money. The United States is a single entity. We pay the money. We're entitled under the collateral source rule to an offset for that. It's our money. Just the way a private person, if a private person paid the money to the plaintiff, the private person would be entitled to offset. That's the standard 920A, I believe, under the restatement of torts, second restatement. That's the way it works under the collateral source rule. It's not as clean cut as that, though, because you don't even know how much you paid. You've got an idea of the percentage. Well, yeah, but that's for you have to put that in evidence in district court. I'm not expecting this court to say we're entitled to a specific amount of money. I'm asking the court to remand it to the district court with instructions to determine this, and the parties will introduce evidence of how much the federal contribution was. Because you're the government, not a corporation here. The corporation didn't get up here and make that argument. We paid it, so we should get it. Actually, if they had paid the money. They didn't. I'm saying in this instance. You're talking about every poor plaintiff that come in that has Medicaid, the government can do it because you're saying part of it is our money, but a corporation couldn't do that. Corporation would have a different argument, but it would not be. No, it wouldn't have that precise argument, no. So the government is treated differently. No, it isn't, Your Honor. The government is treated exactly the way a defendant would be who paid the money. We're not talking about Medicaid. We're talking more generally about money that's paid to the plaintiff. This is the basic common law collateral source rule. But the federal government didn't pay any money to the plaintiff. I guess I'm just generally speaking, right, they didn't get a check from the federal government. No, the state got the money. The state then took the money that the federal government paid it and added some to it and gave it to the plaintiff. So why doesn't the federal government come to the state and get its money back? I mean, I guess it just seems like this woman is caught in the middle of a fight between West Virginia and the U.S. about how they want to kind of share these Medicaid expenses. Why is this on her? Because under the basic collateral source rule, the common law collateral source rule and the statutory collateral source. I'm assuming this is a collateral source, right? The district court said it's not a collateral source. State Medicaid is the collateral source. And the federal government gave some money to state Medicaid. They need to work that out. But that can't be correct because this is federal money. We can prosecute people. The Civil Division of the Justice Department brings false claims act against people who engage in Medicaid fraud. If the judge were right, the district judge were right, we couldn't bring those actions. We couldn't prosecute, the government couldn't prosecute these people. He's not saying it's not federal money. He's just saying for purposes of the collateral source doctrine, the federal government payments are not a collateral source. From the plaintiff's perspective, the collateral source is the state Medicaid payment. That's where the money comes from. But that's not correct either because the money comes primarily from the federal government. And the purpose of that money, giving the money to the state. I'm sorry? Not from the federal government to the plaintiff. That's the reason for giving the money to the state is to give it on to the plaintiff. I do understand what you're saying. And all money is fungible and everything. But I just feel like for purposes, I think the cases where you can prosecute people based on the federal nature of this money, they see it's a slightly different context, at least arguably a slightly different context. Well, those are most of the cases we cited are grant cases. So, yeah, technically it's a slightly different context. But if you look at the Gibbs case, the Ninth Circuit case, it talks about commingled federal and state funds retain their federal character. That's our principle here. The same thing, the In re EB case, the West Virginia case cited in the plaintiff's brief. Are there any cases where what you're trying to figure out is whether for purposes of a tort suit, this is a collateral source? A program like Medicaid? Because I couldn't find any. It just seems like this is sort of a different question. For purposes of trying to figure out what money has already been paid by the defendant to the plaintiff, do you track the money that way? Are there cases doing that? There are no cases that I'm aware of that have precisely this situation. But it fits very neatly into the general doctrines of collateral source, both the common law and the statutory. The statute defines it as such. Thank you. Let me ask you before you leave. We did agree with you to a remand for hearing under this MPLA. Yes. Did we reach the offset issue? Well, that's sort of an offset in itself. But, no, those are alternative arguments. The answer is if we go under the MPLA, the entire amount paid by Medicaid would be ‑‑ You don't get a double recovery. That's right. All right. We'll hear from the other side. I'll give you a few minutes. You've run over, but we'll give you a minute or two. May it please the Court. My name is Mark Mortimer, and I, along with my co‑counsel Rachel Hanna, represent the plaintiff in this action, Misty Sims. And, Your Honor, as the Court, I believe, has demonstrated here today, these issues can make your head hurt. And it is helpful to know that the West Virginia Supreme Court has addressed the issue that Mr. Himmelfarb has such a hard time with. Because what the federal government argues to you is that Misty Sims, although she has presumably a $12 million verdict in her hand, is not responsible for paying for her child's medical bills. That's an absurdity in the law. She's not responsible in terms of having a lien against her. Indeed she is, Your Honor. Indeed she is. Is there a subrogated lien against her under that West Virginia statute? Indeed there is, Your Honor. How is she a recipient? She is a responsible third party under 9511. Where is that in the language? I thought you could get there from that thing you had in the appendix there that she signed. Well, that as well. I could get there through the statute. That as well, Your Honor, and it's also in the statute. If I can find the statute here. Here we go. There it is. If you look at 9511 as it currently exists, 9511A5, it defines third parties from whom the Medicaid division can collect its lien, and it means an individual or entity that is alleged to be liable to pay all or part of the cost of a recipient's medical treatment, medical-related services, whether for personal injury, disease, illness, or disability. Your Honor, under West Virginia Code Section 959, that precedes 9511, it makes it very clear in West Virginia that a parent is responsible for the medical expenses of a child. Indeed, the West Virginia Supreme Court has ruled in Caserta, and then subsequent Caserta being the case that established the wrongful birth cause of action, and then later in another case, Kasdorf v. Kasdorf, which is found at 460 Southeast. If you look specifically at this statute. Yes, sir. It is not there because this thing says, shall be legally subjugated to the rights of the recipient against the third party. She is clearly not a recipient. No, but C.J. is. What this statute does. No, he is, but he's not a party to the action. He's not a party to the action, but he. He was dismissed. But he is. But he wasn't dismissed when the judge made this determination. He was part of the case. Let me see if I can illustrate it for Your Honor. Ms. Sims has a responsibility as a responsible third party to care for C.J. and to pay his expenses. That comes under the case law, you're saying, interpreting 9511B. No, Your Honor. Under West Virginia Code 959, it's a separate statute. It's a legislative enactment. Misty Sims is responsible for the medical care and the cost of the medical care of her child. 9511 gives the Medicaid folks a lien against any person or entity that is a responsible third party for the medical expenses of C.J. You're saying there's a lien that's against, her lien arises under 959? Well, it actually arises under the language of 9511, but the reason 959 makes her a responsible third party, as well as case law in West Virginia. And maybe this would help, Your Honor. In the case of Graham v. DHHR, our Supreme Court addressed this issue sort of in an inverse manner. In that case, one of the plaintiffs, who was a child, made the argument, or their lawyers did, that because the mother completed the application for benefits for the child, the mother is not a liable third party under the statute, the 9511 statute. The West Virginia Supreme Court, in that case, said, and I quote, this court finds absolutely no merit to James's contention that because his mother completed the application for benefits for him, his mother is not a liable third party under the statute. There's no representation before our court that she has a subrogated lien against her by the Virginia representative. Is that an admission at this point? I'm sorry, Your Honor. Is that an admission that if West Virginia now comes up and says, I've got a lien, have you now admitted? Yes, Your Honor, we have. And, in fact, the court below found it and ordered her to pay it, and we didn't appeal that issue because we believe that she owes the state of West Virginia approximately $1,087,000, or thereabouts, if for no other reason, Your Honor, under an equitable remedy of subrogation. DHHR paid the bills. And what is the documentation of that lien? Well, the documentation of the lien is multiple. One is we've been discussing under 9511, incorporating her responsibility as a third party as established by West Virginia Code 959. Looking at this 959, it deals with liability of relatives for support. That's different from 9511. Yes, it is, Your Honor. Connected the two, we're seeing that those people are also recipients for purposes of 9511. No, they're not recipients. They're responsible third parties to reimburse DHHR. 9511 doesn't use recipients. It doesn't use responsible third parties. No, 9511 indicates that the department has a right to subrogation based on the amount of money it paid. It paid for the recipient's bills against a responsible third party. They'll be legally segregated to the rights of the recipient against the third party. Correct. Rights of the recipient. And you have now tied up 959 as a legal right of support to say that recipient must be the same folks in 959. CJ is the recipient. I got that, but answer my question. Answer my question. I'm sorry. Because you're saying 959 makes that recipient all those folks in 959. No, 959 makes Ms. Sims a responsible party to pay the medical care for CJ. The government, Medicaid, paid for CJ's care, but CJ has a right, as against his mother, for payment of his medical bills under state law. That's a cause of action. Is that a lien or a cause of action? That's what CJ has. Both. CJ has a cause of action against his mother. But I didn't see the word lien in there under that 959. Well, there's no lien there. It establishes the fact that Ms. Sims, as the mother. He has a right of action against her, as though he now has a lien against something against her. Therefore, because he has it, you can go against him as a recipient. No, let me rephrase, Your Honor, because it gets a little hairy. Oh, it's already there. The DHHR has a lien for the money that they paid for the recipient, which would be CJ. And that lien, under the terms of 9511, applies to any party that is responsible to pay CJ's bills. 959 says, Ms. Sims, you're the mother. You have a legal responsibility to pay CJ's bills. So, therefore, DHHR, the Medicaid folks, go through CJ and say, Ms. Sims, this statute says that you owe for his medical bills. So you owe us back. We're going to have to pay these medical bills. So why is that not the same thing both of you are asking for? It's just that they now would have to go to the state of West Virginia to get it. If you're going to turn all this money over to the state of West Virginia, then the government can simply just go to the state of West Virginia and say, you've been turning over this money. We want our money back. Your Honor, the government, and I find it interesting that the defendant didn't explain this to the court. The federal government does not have to go to the state of West Virginia and say, you all got all this money. We want ours back. The law requires the state of West Virginia, when it collects money from Ms. Sims for payment of this lien, to pay the federal government back its portion. What are we arguing? Everybody gets paid. The state gets paid. The feds get paid. Ms. Sims collects her judgment. Boom. We're done. What law requires West Virginia to pay the federal government? I'm sorry, Your Honor. That's controlled by the federal Medicaid statutes and the regulations as promulgated by the Secretary of DHHS. I can't give you a citation of the specific record. On that part of the case, you, I won't call it a concession, but you're basically saying that part now, not dealing with the differential and what was billed. For that part, you're saying your client is going to turn over because they have to. The part that is designated Medicaid has paid has to be paid back to them, and that will be paid. It is a statutory first priority lien. And then from that, the state of West Virginia is then obligated to give the government their portion. Everybody gets their money back. I hope it's still that simple, but let me just ask you this. Does that apply to future payments or just past payments? If we can do future, no, it does not. Future is a little different. So this is just the past Medicaid payments that are going from Ms. Sims to West Virginia and then something like 70% to the federal government. So the past is done. And here's why this simplifies the matter, Judge, or judges. Which matter, past or the future? The past. Okay. No, you don't need to simplify that anymore. I'm sorry. You need to move to this future because that future is a first priority. Well, it eliminates any of this argument about collateral source or set-off. If the government gets its money back, then it doesn't have any right to say we want more. But that's what it's saying. Well, when you have future payments, as I understand it, your client is going to get a pot of money. There's no lien. There's no lien. On future payments. That's correct. What if she just ends it? Well, that's one of the reasons why we wanted to keep CJ in as a plaintiff. You can't keep him in as a plaintiff. He's not entitled. Nobody took him out. We weren't going to voluntarily dismiss him. We wanted him in at the end of the case. He doesn't have a cause of action. You don't have jurisdiction. There's no subject matter of jurisdiction there. He does not have a cause of action. Hey, man, we throw him out for you. It couldn't happen. We got him in. But answer that. What happens if mom, yeah, you did in the comment. I don't know how to figure that. What happens if mom blows the money? Or says, I'm not paying anything of the future money. Well, I tell you, I think if the court looks at Judge Chambers' reasoned order and the way he describes a mom, we can all feel safe that she's not going to blow the money. But now that you mention that. We could take in subjective instances of how these things work. We got to write an opinion that's going to apply to everybody, and everybody's not going to be mom. And even if she doesn't blow the money, right? Sorry, I have to think this through slowly. But as to the future payments, right, it's not that she's blowing the money. It's that she's getting this big award for future payments, which will in fact be paid by state Medicaid, and she is not going to owe that money to state Medicaid, or is she? Well, that depends on whether he continues to get Medicaid benefits, and we don't know that future. If they do get paid by Medicaid under this set of statutes you just described because she is liable for his care, will she continue to owe that money to West Virginia? There is an answer. It's difficult, and please allow me to explain. There is no lien that goes on future payments. However, under West Virginia Code, under the MPLA, the portion of the verdict for future damages can be reduced for future collateral source payments if one, two, three, with some exceptions. It's sort of like the tax code. Reducible, right. But so you are – she does not owe that money to West Virginia. There's no lien on it. Not in the future, no. West Virginia is not otherwise going to come after it. That's correct. Okay. So if we're looking at the future, there is no lien, and defendants are entitled to a set-off for collateral source payments in the future under certain – if they can meet three threshold inquiries. And the court did not go there. In this case, Your Honor, the court did go there. The court allowed – Wait a minute. Is that the separate hearing? That's not the separate hearing they asked for. It is. Well, the defendants had a hearing, their 9A hearing, on the papers. We didn't have a hearing where Will went in the courtroom and spent the day, okay? When this was being discussed, during the trial, the court allowed the defendant wide berth on an offer of proof, during which time the defendant submitted evidence to the court that is relevant under a 9A analysis. They submitted the federal registers that you see attached to their brief. They submitted the depositions of their expert witnesses. It separated out payments, whether they would be covered or not covered, and they submitted the deposition or the report. I'm sorry. I said deposition. The report of their life care planner that separated out the numbers as to what she said would be covered and what wouldn't be covered, and of their economist who then did the calculations. Now, here's the problem. Their life care planner, who is the only expert that testified on the future of Medicaid,  would be in existence in the next 14 years. Now, does 959 make her legally responsible for the future? Yes. Yes. 959 does. She's got $10 million, whatever, $8 million there for the future. Why is he entitled to Medicaid? Well, that's a good question. He may or may not be. No, I wouldn't know why. I mean, people with $8 million aren't entitled to Medicaid. Well, sometimes what happens is that $8 million goes into a special needs trust, which allows CJ to continue to qualify. That $8 million is going straight to her bank account unless you got some order because the judge didn't give you the type of reversionary trust anything else on this thing here. It's going to your client's bank account. That's correct. She has $8 million that you say she is legally now responsible for because there's future medical bills, which normally you don't look at the parent's income for Medicaid, I guess. I don't know how that works. Medicaid does. Medicaid waiver does not. Waiver. They're two different programs. Right, right. The Medicaid covers the medical bills. The waiver covers non-medicare. That's why this gets confusing. Yes, absolutely. But here you got $8 million. Why are we talking about Medicaid for the future? She's got $8 million. Well, CJ can continue to qualify for Medicaid if his mother doesn't have the $8 million. If she puts it in what's called a special needs trust for CJ, there's only one trust under the Social Security regulations that qualify to remove assets away so that the child continues to qualify for Medicaid. It's called a special needs trust. It was designed and invented by a guy by the name of Bill Douceau. His affidavit is in the appendix. That was incredible. It's amazing. Until you see what the regs are on it, because the regs for those trusts say that upon the death of the child, the trust must pay first lien, and this goes to your question, Judge, the trust must pay first lien back to Medicaid the benefits that have been paid since the past medicals and on the future medicals. So the idea is that either the mother has to now, let's assume she takes home this verdict, she has to either pay out of pocket for the expenses or if she puts it in a trust, she has to pay back Medicaid after the fact if anything is left. One thing about the federal government is that they're really good at getting their money, or at least that's my observation. So the trust can only be invaded for purposes of the child's needs? The trust is only for the child's needs. And the terms of those trusts are set forth as to what can be and what can't be by the Secretary of DHS, the Federal Department of Health. So as to the future payments, I totally understand what you're saying. It was not a lien. It's all a question of whether those three factors are met. And they didn't meet those. Well, but they would say they didn't have a chance to meet them. They didn't have a chance. They didn't have a hearing in which they were entitled to make this case and have this interesting discussion about will he even be eligible for Medicaid, who knows, like all of that is something the district court was supposed to have a hearing and figure out. Your Honor, six times during the pendency of this case, pre-trial motions, pre-trial motions hearing, motion for directed verdict, offer of proof during trial, post-trial motion, Rule 59E motion. The government has argued this ad nauseum to the district court below, the issues that would be raised in a non-a hearing. Let me ask you this question then. They got all their evidence in. I know what you're saying. So the one response might be, so fine, it goes back to the district court, and by your account, it shouldn't take the district court that long to figure out an answer to this, and you think it will come out your way. So tell me, is there some – I'm just sitting where I'm sitting. It seems like – let the district court have the hearing, pull together this evidence, sort of approach it as it should, carefully under these three factors, figure out how the collateral source rule applies to these future benefits or future payments. What's the downside? Is there some real cost to Ms. Sims in doing it that way? Yes, ma'am. Okay, what is it? One is time, and two is that Ms. Sims, if she had this money, would have 24-hour nursing care, which the government says she should have. She doesn't. She gets 60 hours a week, and I don't care how you count it. That's five days, 12 hours a day. The government and its life care plan expert said this woman should have 24-hour a day nursing care because CJ needs it. I'm sorry, right now, she doesn't have 24? She's getting 60 hours a week now. Based on – That's the limit. The limit under state Medicaid? The maximum under state Medicaid. That's all she gets. Okay. So she's missing out on a lot. Okay. And in the meantime – Is there a way to fix this that, I mean – Yes, Your Honor, there is. But, I mean, because right now there is no trust. That trust you just described, there's no trust like that set up now, right? There is not. There's no obligation for her to do it. And let me suggest this – A gift of $12 million away. Let me suggest this to the court, and it's very stark, and it sounds really bad because it's not going to happen. It is Ms. Sims' money. The government has no right to ask this court to take Ms. Sims' money and put it in a trust that's going to pay back to the government because the government wants it that way. Now, that's going to happen. There's going to be a special needs trust. You told me it's Ms. Sims' money, but on a 959, she's legally obligated for his future medical bills. And she's getting money for his future medical bills. Now you want to say it's her money. She can give it away as she wants to. I'm saying there's a problem with that. And here, there's got to be a way to fix this because you're trying to say they're going to get everything they want, and we're saying it's nice, but the courts don't work on hypothetical trust things that can happen. How can this happen in this litigation now? Is there a way for us to say, District Court, we're going to hold this matter, our decision, and best while you guys get together and work this out, go back down, set up your trust, do all this thing, get the court to approve, agree there's a lien, say all these things are gone, then come back. Because everything you're telling me right now, you're saying they're going to get everything they want. We don't have to agree whether there's a lien or not. That's established by West Virginia law, which must be applied in this case. We don't have to agree on whether Ms. Sims has a legal... You understand what I'm saying? I understand what you're saying, Your Honor. The result is you're saying they're going to get everything they want, but you're giving some hypotheticals that sound very reasonable and even the most prudent thing for this lady to do is to set up this trust and to do all these marvelous things here for his needs. None of that is required. No trust is set up. Not even the question of the lien, arguably, there's probably an argument as to whether that's there or not. It's the recipient. I understand your interpretation of language and there. All I'm saying is you are essentially agreeing, from what I understand, with them. They're entitled to this, not offset, I don't want to use the word, but this amount that's going to the state of West Virginia. They're going to get their money back. That's right. Yes. Is there not mechanisms that can be done at this point so that we can be satisfied, well, you've got your money back, and then that makes this move? We've had a hard time getting the government to agree to anything in this case. I don't think they would agree to that. If you could say, I'm going to give you your money back, that's all they want. Let me give you an example. Judge Chambers said, Miss Sims, I'm going to give you this money, but you have to give a million dollars of it back to the state government who's then going to pay the feds back what they're at. And we said, okay. We didn't appeal that. They appealed it. They're the ones getting the money back, and they're the ones saying, oh, no, we don't want that to happen. I'm a little concerned whether they get it from the state of West Virginia. I didn't agree with the judge on that. Now, West Virginia paid this money. They need to get that money from West Virginia. I'm not sure you have to give it to them directly. Well, you know, there's four or five North Carolina cases that address this issue, which basically say, you know, if there's a lien and the government's getting this money back, then why doesn't everybody just calm down? You know, the lien removes these issues about setoff and collateral source and so forth. Everybody's getting their money back. I'm just thinking there's an opportunity for someone to sit down and settle this thing out and work through it before you get us to write an opinion maybe neither one of you are going to like. That may be, Your Honor, but I think we might need your mediation services. We do have court media. I understand that. And if you would like for us to bail that out again. But I'm telling you, any time I hear a party say, we're going to give them everything they want and they are shaking their heads, yes, we'll take it. There's some disconnect here. Maybe you don't like the way it's going to be given or you don't want to bind your client's hands to do it. Then that's a whole different thing. I've never had an opposing party appeal a judge's order that said that my client had to pay them money. So this is a new one for me. Part of negotiating is mediation. You're going to have to move forward. If you keep looking about the way you mistreated me in the past and you've been acting, it's not going to happen. You and I know that. Sure. But I'm saying from a forward perspective, this case seemed right for an opportunity. It is a very convoluted case. It's a cause of action that is very new. This case is like a dog chasing its tail. We're working our way through it. And we're going to give it the best shot and write the best opinion we can on it, but we're going to affect a whole lot of folks out there with that opinion. Hopefully it's the best opinion. If we don't, we'll come back and we'll work with it later. The Supreme Court will work with it. But you've got an opportunity here, I think, to sit down. And if you can start from ground one without going back to what has happened, I think you could work this out. Well, there seems to be some money to spread around. I'll give you that. Do you think you could work it out? If I have somebody reasonable on the other side of the table. But let me give you an example, Judge. Let me give you an example. And I know I'm sounding recalcitrant here. They have a figure amount of money that was paid to Medicaid. Would you just pay that back? And then I guess the future is then what you have to worry about. And you've already taken care of that with that special needs little trust. They don't like that, Judge. That's the problem. I don't understand that. When they get back up and ask them, do you like that man? And will it work? Because it sounds like to me, that sounds pretty reasonable to me. Well, and, you know, what they want is this thing called a reversionary trust where you end up with the courts deciding what the future medical care should be. It doesn't work. What shall I say? I do want to point out that the defendant had every opportunity to submit all evidence it wanted to submit in respect to the 9A issues, that the court considered that evidence and considered the arguments of the defendant multiple times below. The failure to have all of us all come together inside the courtroom for a day and argue about this is harmless. And the reversionary trust, as I've already mentioned, is dangerous. Okay. Well, thank you for your argument. I'm going to continue to encourage you to think about this. We moved pretty quickly up here. I don't want you to leave here feeling like the fact that you say it's a lien is absolutely a lien. There's a lot of argument on both sides. All these issues are up in the air, and that's just to be honest with you. I mean, I don't want you to leave here thinking, well, I made such a point. But sometimes you'll see judges doing this and say, oh, we won that. This is not that kind of case because this is a very . . . There are issues here we haven't even gotten to, that whole arc, and it goes on and on. And, you know, we're the type that like to get into this stuff now. This is what we call the good part of this job is when you can do these kind of cases here. But I like to see the parties work it out rather than have to be submitted to what we tell you you have to do. And we will tell you. I fully understand, Your Honor. If that's what you want, you're going to get it. I fully understand that you won't let either party write the court's opinion. That's right. So we're here from the other side. We've got a brief rebuttal. Thank you, Your Honor. Well, you know what I'm going to ask. Is there opportunity for you guys to sit down? Would you be reasonable? Your Honor, there was a scheduled mediation in this case. It was canceled. And the reason it was canceled was the case was they asked for expedition. The court accelerated it. The case was set for argument. And we were ready with mediation. So, yes, of course we would be willing to discuss that. I think that opportunity is still available to the parties here. And I think both parties would be well served to at least consider sitting down and working through this because your opposing counsel, everything he's saying, I mean, it's like wondering why you're even here. Well, Your Honor, can I respond to that, please? Because I have no idea what he's talking about when he says that they're giving us everything we want. I don't accept it for what he's saying. If he said it, then say okay. Well, I'll tell you what we want. Let me just summarize. This is a worthwhile summary. I think what we want is past damages are $0.00 because of the nature of this cause of action and the fact that there's no legal option. What you actually might get might be what you pay there. I'm not sure you get the $0.00. You got this whole reasonable medical expense stuff in West Virginia where they got this whole thing they go through where they're not worried about what social services are paid on something as opposed to what's actually paid. That's right, which doesn't apply in this case. That doesn't apply in this case. But I would have to kind of work through that when you go to mediation. You can't always get what you want. That's right. But what's reasonable and what you can get. I understand, Your Honor, but I'm responding to what Mr. Moreland said. That's not what we want. That's why we're here because that's not what we want. For future damages, what we want is we want to remand with some instructions to the district court to do the 9A hearing. The district judge refused to do the 9A hearing. He said he was going to do it and then just canceled it, didn't do it. I wouldn't let little trust that he talked about, that niece trust, do it. Sounds like to me you got that thing set up there. She can't do anything with this money. You get a child's needs, child dies, all the money. The thing to keep in mind here is that under the West Virginia waiver program, the child's eligibility for that program has nothing to do with the parent's income or assets. So she has this multimillion-dollar recovery. She could go to Aruba tomorrow if she wanted to. That's right. We've suggested a trust, and they've been fighting it all along. He didn't say he set up a trust. Yeah, that's right. But the way it should be set up is the way we've suggested in point three of our brief, as a reversionary trust. Well, it should be a reversionary trust. That's right. But that's an important thing. And I would hope that the court would take our argument seriously in point three of the brief, that it should be set up as a reversionary trust. That avoids a lot of the speculative nature of future damages. We can go back to the district judge and say this much is covered by Medicaid, this much is not. I'm sorry? You set her money up in our trust account, not C.J.'s money. What authority do we have to tell her to do that? You have the authority to do it under the Federal Tort Claims Act as a reversionary trust. That's where the authority comes in. And the cases we've cited about that, including this court's decision in Cibola. If it's a reversionary trust, who makes the decisions about what money goes out of there? There's a trustee set up. Normally there would be a trustee set up who would decide where the money goes. And then, you know, given that the district judge admitted that the life expectancy he determined is somewhat speculative, that's a way of protecting. I get the reversionary part. Yes. I'm trying to figure out how it works sort of day to day because I gather her concerns. Normally there's professional management of these trusts. They invest it and they try to get a good return on it so that it's actually better than just sticking it in her bank account. So she's saying, look, I need 24-hour nursing care. That's right. She's getting it under a reversionary trust? Well, that's an independent issue. We've been told by West Virginia that if they request it, they will get that. I can't speak to that. That's what they've told us. But this will cover the future. The trust will cover all of the expenses of the child that are not covered by Medicaid. That trust is within the matter of the district court discretion. That's correct. That's correct. We've got case law that sets forth that, you know, when you have a creation of a reversionary trust, it's appropriate in the Federal Tort Claims Act action to the extent such a remedy would hold the government liable in the same manner, to the same extent, as a private individual under like circumstances. That's right. So how's that going to get her? I beg your pardon? How's it going to get her, C.J.? I mean, how's it going to get the mother? At this point, we're assuming that the mother has a right to recover just, you know, even though she's not the recipient. She's not the recipient. No, this case is really a messed up case. I have to say that. That's what I'm trying to say. They've offered a different type of trust, and you want to insist on a trust in which I don't see how it fits. The district court found it. But they just said another type of trust, and I'm not going to get into this trust law today because that was not an area I wanted to deal with too much. Right. But they deal with this needs trust. That made a lot of sense to me. Yes. That would be one solution. Is that the same kind of trust as he did? No, there are similarities. But, no, the idea of the reversionary trust is it's set up to pay for all the future damages that are accrued. But she's not obligated to do that. She's not obligated, but the district judge is also not. The district court is not obligated to impose it, not under West Virginia law. No, he's not obligated to do it, but he didn't exercise his discretion at all. The district judge thought that he could do it only if the law required him to do it, and that is not the case. That's not how I read what the district court said. It seemed like the district court said it's not required by law, and so I'm not doing it. And so I'm not going to do it because it's not required. He told the truth. He wasn't required. But it's not required. He's not required. But he has to be like he thought it was forbidden or something. No, no, and that's not what we were saying, Your Honor. What we were saying is that the case law sets us up as a discretionary decision. It's not a mandatory decision. It's not a prohibited decision, either. It's discretionary. So the judge, under the facts of the case, has to look at it and decide whether, in his discretion, it's appropriate to do this and to explain why. And that's what we wanted the remand for on the ---- He wanted a better explanation than what he provided because he just alluded ---- He didn't give an explanation, yes. He alluded back to Ms. Simms' concerns, right? I don't have it in front of me, but doesn't he say something like, you know, she says she doesn't want it. Yeah, he cites the party's arguments. Yeah, well, that ---- But he doesn't say ---- I mean, I agree it's not like a really full explanation. Right. No, it is true that if the court remands it, the judge could say, well, you know, of course I'm not going to do it because, and here's why, it's not in the child's interest or something. He could say that, but right now we're asking for it to be sent back so he can make the case to the judge that it should be set up. If you choose to take my offer, let us know quickly. If not, you're going to get an answer for us. Okay. Thank you for your answer. Thank you very much. Thank you. The court will be adjourned. This hour report stands adjourned until tomorrow morning. God save the United States and this hour report.
judges: James A. Wynn, Jr., Pamela A. Harris, Loretta Copeland Biggs